UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

|  |  |
|---|---|
| DAMON VICTOR CRIST, | Case No. 1:24-cv-00180-DKG |
| Plaintiff, | **MEMORANDUM DECISION AND ORDER** |
| v. | |
| ADA COUNTY; DEPUTY COWLES; DEPUTY MILLER; and DEPUTY BARBER, | |
| Defendants. | |

At the time this civil rights action was filed, Plaintiff Damon Victor Crist—who is proceeding pro se and in forma pauperis—was a pretrial detainee held in the Ada County Jail. Plaintiff was later transferred to the custody of the Utah Department of Corrections. *See* Dkt. 104. It is unclear whether Plaintiff remains incarcerated.

Plaintiff was initially allowed to proceed on his claims under 42 U.S.C. § 1983, as well as claims under Idaho state law, against all named Defendants. *Init. Rev. Order*, Dkt. 15. Plaintiff has since voluntarily dismissed three claims and four individual Defendants. *See* Dkts. 78, 90. Accordingly, the only claims remaining are four claims against Defendants Ada County and Ada County Sheriff's Deputies Cowles, Miller, and Barber.

In Claim I, Plaintiff asserts he was subjected to disciplinary charges in retaliation for using certain language in a jail grievance. *First Amended Complaint ("FAC")*, Dkt. 11, at 10–11. At the time Plaintiff was disciplined, the jail had a policy of prohibiting

MEMORANDUM DECISION AND ORDER - 1

disrespectful, insulting, or vulgar language in grievances. The Court will refer to this policy as the Abusive Language Policy. Claim I is asserted against Defendant Ada County under *Monell v. Dep't of Social Services of the City of New York*, 436 U.S. 658, 694 (1978) (holding that a § 1983 claim against local governmental entity requires a plaintiff to show that a policy, custom, or practice of the entity was the moving force behind the constitutional violation).

Claim II asserts that the remaining individual Defendants—Deputies Cowles, Miller, and Barber—retaliated against Plaintiff by charging him with abuse of the grievance process and by placing him in a more restrictive housing unit when he was found guilty of the violations. These disciplinary charges were based on the jail's then-applicable policy of prohibiting multiple grievances on the same issue. *Id*. at 12–15. The Court will refer to this policy as the Repeat Grievance Policy.

Claim III is also based on the Repeat Grievance Policy and alleges that Plaintiff's disciplinary charges for violating that policy were retaliatory. This is a *Monell* claim against Ada County, rather than against the individual Defendants. Plaintiff alleges that the County failed to adequately train jail employees about the requirement that inmates must exhaust available administrative remedies. *Id*. at 12. The crux of Claim III is Plaintiff's contention that he was required to file repeat grievances in order to exhaust his remedies prior to filing suit in federal court, so any discipline based on those grievances was unconstitutionally retaliatory. *Id*. at 12–15.

In Claim VII, Plaintiff alleges that being disciplined for violating the Abusive Language Policy and the Repeat Grievance Policy constituted punishment. As a result,

MEMORANDUM DECISION AND ORDER - 2

Plaintiff asserts, the discipline violated his right to due process.[1] *Id*. at 19. This is also a *Monell* claim against Ada County. *Id*.

Plaintiff and Defendants have filed cross-motions for summary judgment and motions for judicial notice. Plaintiff has also filed a motion to stay. All parties have consented to the jurisdiction of a United States Magistrate Judge to conduct all proceedings in this case in accordance with 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. *See* Dkt. 35.

Having carefully reviewed the record, the Court finds that the facts and legal arguments are adequately presented in the briefs and record and that oral argument is unnecessary. *See* D. Idaho Loc. Civ. R. 7.1(d). Accordingly, and for the reasons that follow, the Court enters the following Order (1) denying Plaintiff's Motion for Stay, (2) granting in part both parties' motions for judicial notice, (3) granting Defendants' Motion for Summary Judgment, and (4) denying Plaintiff's Motion for Summary Judgment.

## PLAINTIFF'S MOTION FOR STAY

Plaintiff seeks an "immediate stay" lasting 180 days. Dkt. 102 at 1. Plaintiff bases this request on the fact that his Idaho criminal case has become final; Plaintiff expected to be transferred back to a Utah prison, where the prisoner intake process "takes months,"

---

[1] Though Claim VII also alleges that Plaintiff's discipline constituted retaliation by Ada County, this portion of the claim is duplicative of Claims I and III and, therefore, does not require separate discussion.

MEMORANDUM DECISION AND ORDER - 3

and new prisoners have no legal resources available to them during the intake process. *Id*. Plaintiff is now in Utah.

However, Plaintiff's claims of difficulties are belied by the fact that he has been able to file all required briefing in this matter. In addition, dispositive motions are already ripe for adjudication and will be resolved in this decision. Therefore, the Court finds no reason to stay this case, and Plaintiff's Motion for Stay will be denied.

## MOTIONS FOR JUDICIAL NOTICE

Plaintiff asks the Court to take judicial notice of an amended complaint that was filed in another of Plaintiff's civil rights cases. *See* Dkt. 95 (seeking judicial notice of Dkt. 6 in *Crist v. Clive*, No. 1:25-cv-00258-BLW (D. Idaho July 7, 2025). Defendants ask for judicial notice of a special verdict form in *Williams v. Fox*, No. 1:16-cv-00143-DCN (D. Idaho Nov. 17, 2022). *See* Dkt. 91-3 (seeking judicial notice of Dkt. 307 in that case).

Federal Rule of Evidence 201 permits a court to take judicial notice of facts not subject to reasonable dispute that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). The Court may take judicial notice of court filings and other court records. *Barron v. Reich*, 13 F.3d 1370 (9th Cir. 1994); *United States v. Wilson*, 631 F.2d 118, 119 (9th Cir. 1980); *Von Koenig v. Snapple Beverage Corp.*, 713 F. Supp. 2d 1066, 1073 (E.D. Cal. 2010).

A court may not, however, take judicial notice of a fact that is "subject to reasonable dispute." Fed. R. Evid. 201(b); *see also City of Sausalito v. O'Neill*, 386 F.3d 1186, 1223 n.2 (9th Cir. 2004) ("We may take judicial notice of a record of a state agency not subject to reasonable dispute."); *Arizona Libertarian Party v. Reagan*, 798 F.3d 723,

MEMORANDUM DECISION AND ORDER - 4

727 (9th Cir. 2015) ("We may take judicial notice of official information posted on a governmental website, the accuracy of which is undisputed.") (citations and alterations omitted). Therefore, a court may take judicial notice of government and other court documents to prove their existence and contents, but not for the truth of the matters asserted in the documents where those matters are disputed.

The Court will grant the parties' motions for judicial notice as to the existence and content of the documents. The Court will not judicially notice any disputed fact contained in these documents.

## LEGAL STANDARDS

### 1.    Summary Judgment Standard of Law

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the summary judgment rule "is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). It is not "a disfavored procedural shortcut," but is instead the "principal tool[] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327. In other words, "summary judgment serves as the ultimate screen to weed out truly insubstantial lawsuits." *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998).

In resolving a summary judgment motion, the Court must consider the facts in the light most favorable to the non-moving party, unless the non-moving party's version of

MEMORANDUM DECISION AND ORDER - 5

the facts is "blatantly contradicted by the record[] so that no reasonable jury could believe it." *Scott v. Harris*, 550 U.S. 372, 380 (2007). If such a blatant contradiction exists, then there is no "genuine" dispute as to that fact. *Id*.

The moving party bears the initial burden to show that each material fact cannot be disputed. Material facts are those "that might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To show that the material facts are not in dispute, the moving party may cite to particular parts of materials in the record or show that the non-moving party is unable to produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(A) & (B).

If the moving party meets this initial responsibility, the burden then shifts to the non-moving party to establish that a genuine dispute as to any material fact does indeed exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Once a moving party has sufficiently supported its motion for summary judgment, the non-moving party must come forward with significant, probative evidence demonstrating the existence of a triable issue of fact." *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1477 (11th Cir. 1991).

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment ...." *Liberty Lobby*, 477 U.S. at 247–48. Rather, a case will survive summary judgment only if there is a *genuine* dispute as to a *material* fact. In other words, "there must be evidence on which [a] jury could reasonably find for the [non-moving party]." *Id*. at 252. Statements in a

MEMORANDUM DECISION AND ORDER - 6

brief, unsupported by the record, cannot be used to create a dispute of fact. *Barnes v. Indep. Auto. Dealers*, 64 F.3d 1389, 1396 n.3 (9th Cir. 1995).

The Court must consider "the cited materials" in considering a motion for summary judgment, but it may also consider "other materials in the record." Fed. R. Civ. P. 56(c)(3). The Court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (internal quotation marks omitted). Rather, the "party opposing summary judgment must direct [the Court's] attention to specific, triable facts." *So. Ca. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003); *see also Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (stating that, once the moving party meets its initial burden, the non-moving party must "identify with reasonable particularity the evidence that precludes summary judgment.") (internal quotation marks omitted).

In opposing a motion for summary judgment, the non-moving party must submit at least "some competent evidence," such as a "declaration, affidavit, [or] authenticated document," to support his allegations or to dispute the moving party's allegations. *Soto v. Sweetman*, 882 F.3d 865, 873 (9th Cir. 2018) (upholding grant of summary judgment against pro se inmate because the "only statements supporting [plaintiff's] ... argument are in his unsworn district court responses to the defendants' motion for summary judgment and to the district court's show-cause order"). If the non-moving party fails to produce such evidence, the Court "is not required (or even allowed) to assume the truth of the challenged allegations in the complaint." *Butler v. San Diego Dist. Attorney's Office*, 370 F.3d 956, 963 (9th Cir. 2004).

MEMORANDUM DECISION AND ORDER - 7

Affidavits or declarations "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). A "conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence," does not create a genuine dispute of material fact. *F.T.C. v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997), *as amended* (Apr. 11, 1997).

The Court does not determine the credibility of affiants or weigh the evidence set forth by the parties. Although all reasonable inferences that can be drawn from the evidence must be drawn in the light most favorable to the non-moving party, *T.W. Elec. Serv., Inc.*, 809 F.2d at 630–31, the Court is not required to adopt unreasonable inferences from circumstantial evidence, *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

If a party "fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the Court may consider that fact to be undisputed. Fed. R. Civ. P. 56(e)(2). The Court must grant summary judgment for the moving party "if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(3).

In cases involving pro se inmates, courts liberally construe the pleadings and briefs and "should avoid applying summary judgment rules strictly." *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010). However, though pro se inmates are exempted "from *strict* compliance with the summary judgment rules," they are not exempted "from *all* compliance." *Soto*, 882 F.3d at 872.

MEMORANDUM DECISION AND ORDER - 8

Because Plaintiff was an inmate when he filed his initial complaint, this case is subject to the Prison Litigation Reform Act of 1996 ("PLRA").[2] The PLRA was enacted "to stop federal courts from micromanaging our Nation's prisons" and "from providing more than the constitutional minimum necessary to remedy [a] proven violation of federal rights." Shima Baradaran-Robison, *Kaleidoscopic Consent Decrees: School Desegregation and Prison Reform Consent Decrees After the Prison Litigation Reform Act and Freeman-Dowell*, 2003 B.Y.U. L. Rev. 1333, 1351 (2003) (internal quotation marks omitted). The PLRA imposes numerous restrictions on actions challenging the constitutionality of prison or jail conditions. These restrictions include allowing the Court to review a complaint at any time to determine whether dismissal is appropriate. *See* 28 U.S.C. § 1915A. The same type of review is authorized in cases brought by in forma pauperis litigants such as Plaintiff. 28 U.S.C. § 1915(e)(2)(B).

Therefore, in addition to considering the parties' arguments and evidence on summary judgment, the Court must also dismiss any claim in the First Amended Complaint if it is frivolous or malicious, seeks monetary relief from a defendant who is immune from such relief, or fails to state a claim upon which relief may be granted. 28 U.S.C. §§ 1915(e)(2)(B), 1915A(b).

A complaint fails to state a claim for relief if it does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft*

---

[2] The PLRA applies to cases filed by pretrial detainees, not only to those filed by convicted prisoners. 28 U.S.C. § 1915A(c) ("[T]he term 'prisoner' means any person … detained in any facility who is accused of … violations of criminal law ….").

*v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This standard is met when a complaint contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556).

"[D]etailed factual allegations" are not required, but a plaintiff must offer "more than … unadorned, the-defendant-unlawfully-harmed-me accusation[s]." *Id.* (internal quotation marks omitted). If the facts pleaded are "merely consistent with a defendant's liability," or if there is an "obvious alternative explanation" that would not result in liability, the complaint has not stated a plausible claim for relief. *Id.* at 678, 682 (internal quotation marks omitted). Bare allegations amounting to a mere restatement of the elements of a cause of action, without adequate factual support, are not enough.

## 2. Standards of Law Governing § 1983 Claims

Plaintiff brings his claims under 42 U.S.C. § 1983, the civil rights statute. To state a plausible civil rights claim, a plaintiff must allege a violation of rights protected by the Constitution or created by federal statute proximately caused by conduct of a person acting under color of state law. *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). A defendant causes a constitutional deprivation within the meaning of § 1983 "if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation." *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978).

Jail officials generally are not liable for damages in their individual capacities under § 1983 unless they personally participated in the alleged constitutional violations.

MEMORANDUM DECISION AND ORDER - 10

*Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989); *see also Iqbal*, 556 U.S. at 677 ("[E]ach Government official, his or her title notwithstanding, is only liable for his or her own misconduct."). Section 1983 does not allow for recovery against an employer or principal simply because an employee or agent committed misconduct. *Taylor*, 880 F.2d at 1045.

However, "[a] defendant may be held liable as a supervisor under § 1983 'if there exists ... a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.'" *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (quoting *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989)). A plaintiff can establish this causal connection by alleging that a defendant (1) set in motion a series of acts by others that violated the Constitution, or knowingly refused to terminate a series of such acts, which the supervisor "knew or reasonably should have known would cause others to inflict a constitutional injury"; (2) knowingly failed to act or acted improperly "in the training, supervision, or control of his subordinates"; (3) acquiesced in the constitutional deprivation; or (4) engaged in "conduct that showed a reckless or callous indifference to the rights of others." *Id*. at 1205–09 (internal quotation marks omitted).

A claim that a supervisor or training official failed to adequately train subordinates ordinarily requires that, "in light of the duties assigned to specific officers or employees[,] the need for more or different training [was] so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the [supervisor or training official] can reasonably be said to have been deliberately indifferent to the need." *City of Canton v. Harris*, 489 U.S. 378, 390 (1989). In other words, to maintain a failure-to-train

claim, a plaintiff must allege facts showing a "pattern of violations" amounting to deliberate indifference. *Connick v. Thompson*, 563 U.S. 51, 72 (2011).

Likewise, "a failure to supervise that is sufficiently inadequate may amount to deliberate indifference" that supports a § 1983 claim, but there generally must be a pattern of violations sufficient to render the need for further supervision obvious. *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (internal quotation marks omitted). That is, if a supervisory or training official had "knowledge of the unconstitutional conditions" through such a pattern of violations—including knowledge of the "culpable actions of his subordinates"—yet failed to act to remedy those conditions, that official can be said to have acquiesced "in the unconstitutional conduct of his subordinates" such that there is a causal connection between the supervisor and the constitutional violation. *Starr*, 652 F.3d at 1208.

To bring a § 1983 claim against a local governmental entity such as Ada County, a plaintiff must allege that the execution of an official policy or unofficial custom inflicted the injury of which the plaintiff complains, as required by *Monell*. The requisite elements of a § 1983 claim against such an entity are the following: (1) the plaintiff was deprived of a constitutional right; (2) the entity had a policy or custom; (3) the policy or custom amounted to deliberate indifference to plaintiff's constitutional right; and (4) the policy or custom was the moving force behind the constitutional violation. *Mabe v. San Bernardino Cnty.*, 237 F.3d 1101, 1110–11 (9th Cir. 2001).

Even if a plaintiff shows that his constitutional rights were violated, individual government actors are not liable for damages under § 1983 if they are entitled to qualified immunity.

The doctrine of qualified immunity protects government officials from personal liability for on-the-job conduct so long as the conduct is objectively reasonable and does not violate an inmate's clearly established federal rights. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). True to its dual purposes of protecting state actors who act in good faith and redressing clear wrongs caused by state actors, the qualified immunity standard "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (internal quotation marks omitted).

A qualified immunity analysis consists of two prongs: (1) whether, "[t]aken in the light most favorable to the party asserting the injury, ... the facts alleged show the [defendant's] conduct violated a constitutional right"; and (2) whether that right was clearly established. *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *modified on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009). A district court may exercise its discretion to analyze the qualified immunity prongs in either order, and the resolution of the second prong may obviate the need to address the first. *Pearson*, 555 U.S. at 236. If a defendant meets the initial burden on summary judgment, a plaintiff can avoid summary judgment on qualified immunity grounds only upon showing that there was a violation of a constitutional right *and* that the right was clearly established.

MEMORANDUM DECISION AND ORDER - 13

To determine whether the right at issue was clearly established, the Court turns to Supreme Court and Ninth Circuit law existing at the time of the alleged violation. In the absence of binding precedent, courts should look to available decisions of other circuits and district courts to ascertain whether the law is clearly established and should also consider "the likelihood that [the Ninth Circuit] or the Supreme Court would have reached the same result." *Osolinski v. Kane*, 92 F.3d 934, 936 (9th Cir. 1996).

Determining whether a right is clearly established requires courts to define the right specifically, rather than as a "broad general proposition." *Saucier*, 533 U.S. at 201. The Supreme Court has repeatedly instructed courts "not to define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014) (internal quotation marks and citation omitted).

Stated another way, a jail official "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that *any* reasonable official in the defendant's shoes would have understood that he was violating it." *Id*. at 778–79 (emphasis added). "The relevant, dispositive inquiry … is whether it would be clear to a reasonable officer that his conduct was unlawful *in the situation he confronted*." *Saucier*, 533 U.S. at 202 (emphasis added).

Though it is not necessary for a plaintiff to show that the "very action in question has previously been held unlawful," *Anderson v. Creighton*, 483 U.S. 635, 640 (1987), "existing precedent must have placed the statutory or constitutional question beyond debate," *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (internal quotation marks omitted).

MEMORANDUM DECISION AND ORDER - 14

That is, a court may deny an official qualified immunity only if the plaintiff can "*identify a case* where an officer taking similar actions in similar circumstances was held to have violated the Constitution." *Zorn v. Linton*, 146 S. Ct. 926, 930 (2026) (per curiam) (emphasis added) (internal quotation marks and alteration omitted); *see also Smith v. Agdeppa*, 81 F.4th 994, 1008 (9th Cir. 2023) ("[Defendant] is entitled to qualified immunity because [Plaintiff] does not identify a single precedent—much less a controlling case or robust consensus of cases—finding a [constitutional] violation under similar circumstances.") (internal quotation marks omitted); *Sharp v. Cnty. of Orange*, 871 F.3d 901, 911 (9th Cir. 2017) ("Plaintiffs must *identify a case* where an officer acting under similar circumstances as defendants was held to have violated [the right at issue]." (internal quotation marks and alteration omitted). If no case so holds, then it cannot be said that the defendant "acted unreasonably in these circumstances," and the defendant is entitled to qualified immunity. *Mullenix v. Luna*, 577 U.S. 7, 14 (2015).

## FACTUAL BACKGROUND

This section includes facts that are undisputed and material to the resolution of the issues in this case.

The Court will first consider Defendants' Motion for Summary Judgment. Therefore, where material facts are in dispute, the Court will use the version of the facts set forth by Plaintiff, insofar as that version is not blatantly contradicted by clear documentary evidence in the record. *See Scott*, 550 U.S. at 380.

The Ada County Jail has a grievance process in which inmates can submit concerns to jail officials. The purpose of this grievance process is "to address inmate

concerns in a professional, respectful, fair, and timely manner." *Ex. A to Amended First Declaration of Justin Ivie* ("*Am. First Ivie Decl.*"), Dkt. 93, Bates No. Ada County 23. An inmate with a concern should try to resolve the process informally with jail staff. If the concern cannot be resolved by this informal process, the inmate may submit a grievance. *Id*. The grievance system protects inmates from retaliation for using the grievance process, and the policy specifically states, "No reprisal or retaliation is permitted against an inmate who has filed or appealed a grievance." *Id*. at 941.

At the time of the events giving rise to Plaintiff's claims, Ada County Jail's Abusive Language Policy required that inmates use "respectful language to express grievances or requests," and a grievance containing "vulgar words or otherwise insolent language" could subject an inmate to discipline. *Id*. In addition to prohibiting disrespectful, vulgar, or insolent language, the policy prohibited grievances that were intended to "annoy[]," "irritate[]," or "slander" another person. *Id*. at 24. Frivolous grievances—those that are "utterly without merit, irresponsible, or have no rational basis in fact, regulation, policy, or law"—were also considered abuses of the grievance process and could subject an inmate to discipline. *Id*.

When Plaintiff's claims arose, the Ada County Jail's Repeat Grievance Policy prohibited inmates from submitting new grievances on an issue that had already been grieved. *Id*. at 23. According to that policy, "[o]nce a grievance has been answered and appealed (if appropriate), repeatedly grieving/requesting the same issue constitutes an abuse of the process and can result in disciplinary action." *Id*.

MEMORANDUM DECISION AND ORDER - 16

On May 25, 2023, Plaintiff submitted a grievance, identified as Grievance No. 251838131 ("Grievance 8131"), in which he discussed a visit he had with jail medical provider Clive. In Grievance 8131, Plaintiff complained of Clive's alleged "Conspiracy Behavior" and expressed Plaintiff's negative feelings as follows:

> I recognize I'm not particularly liked among the "Clive supporters" in this medical unit. Some very likely believe I'm a liar and attempted to unfairly attack Clive's career. Though I normally wouldn't care about his behavior, having a provider mock me openly with snide ass comments like "well I don't know why you are not healing… do you?" And the entire mockery of a visit today… Know this, other professionals played these games with lives and pain and lost their jobs over my litigation. So keep on playing games and mocking… AND NO DOUBT falsifying patient encounter postings, just like the last idiots so when this baby unravels on *you pieces of shit*, I can say I told you so. I am counting the days until I have all of you in court. And its [sic] coming…

*Ex. B to Am. First Ivie Decl*. at 2691 (emphasis added) (ellipses and capitalization in original). Plaintiff did not propose a resolution to any identifiable issue in this grievance.

Jail staff who reviewed Grievance 8131 found that it violated the jail's Abusive Language Policy based on Plaintiff's calling jail employees "pieces of shit." *Ex. C to Am. First Ivie Decl*. at 2662–67. Staff initially concluded the grievance also violated the Repeat Grievance Policy. *Id*.

Plaintiff was charged with abuse of the grievance process and found guilty of this violation. The reviewing officer, who is not a Defendant in this case, upheld the disciplinary report based on the Abusive Language policy, but not the Repeat Grievance Policy. Plaintiff received two days' loss privileges, which was reduced from the

MEMORANDUM DECISION AND ORDER - 17

originally recommended three days. *Id.* at 2663–64. Plaintiff claims he was also placed in "isolation" for these two days, *FAC* at 4, though Defendants have submitted evidence suggesting that Plaintiff was in "a two-person cell within a larger pod of multiple cells" and retained his ability to use the kiosk and speak with other inmates. *Am. First Ivie Decl.* ¶¶ 11–12. After these two days of discipline, Plaintiff was reclassified and transferred to a non-dormitory cell block, which permits less out-of-cell time for inmates than dormitory housing units. *Pl. Stmt. of Undisputed Facts in Supp. of Mot. Summ. J.*, Dkt. 94-1, at 4.

In a later grievance, Plaintiff objected to being punished for the abusive language he used in Grievance 8131. Plaintiff also acknowledged, however, that his name-calling "wasn't nice" and that he had simply been "venting" in Grievance 8131. *Ex. D to Am. First Ivie Decl.* at 2611.

Several days later, Plaintiff discussed Grievance 8131 when he submitted an Inmate Request. Plaintiff "recognize[d]" his "misstep with name calling," admitting again that had used Grievance 8131 merely to "vent" about his dissatisfaction with medical provider Clive. *Ex. E to Am. First Ivie Decl.* at 3331; *see also First Declaration of Damon Crist ("First Crist Decl.")*, Dkt. 3-1, ¶ 12 (describing medical appointment with Clive as "emotion stirring" and stating, "I felt my 'safe place to vent' was a grievance.").

On June 26, 2023, Plaintiff filed a grievance asking that "video footage" of "an alleged assault" be preserved for litigation. *Ex. F. to Am. First Ivie Decl.* at 3287. It does not appear that Plaintiff received a response to this grievance. *Id.*

Not having received a response, Plaintiff submitted Grievance No. 262484341 ("Grievance 4341") on July 7, 2023. Grievance 4341 requested preservation of the video of the alleged assault and referenced the previous unanswered grievance. *Ex. G to Am. First Ivie Decl*. at 2600. This time jail staff did respond, stating that the "incident has been investigated and closed, [and] all information and material has been saved accordingly." *Id*.

Plaintiff was unsatisfied with this response and submitted a new grievance: Grievance No. 262575661 ("Grievance 5661"). Grievance 5661 raised the same issue, again asking that the video in question be preserved. *Ex. H to Am. First Ivie Decl*. at 2598 ("Grievance response [to Grievance 4341] does not give me the answer I sought…. I want the classroom and the officer desk [footage] preserved for the litigation.").

Staff responded to Grievance 5661 as follows: "Everything regarding this incident has been documented including video and saved.… [P]lease do not continue to grieve this." *Id*. The response clearly warned Plaintiff that continued grievances on the same issue could subject him to discipline under the Repeat Grievance Policy. *Id*.

Plaintiff then submitted yet another grievance about the same issue. Grievance No. 263551221 ("Grievance 1221") reiterated Plaintiff's request for preservation of the video of the assault: "What does [the response to Grievance 5661] mean? Since investigation is closed, the video will be erased??? Clear questions warrant clear answers. I cannot know staff policy for investigated footage!!!" *Ex. I to Am. First Ivie Decl*. at 2597. Plaintiff expressed this belief that the video might be erased despite the plain statement, in the response to Grievance 5661, that the video had been preserved.

MEMORANDUM DECISION AND ORDER - 19

Deputy Cowles concluded that Grievance 1221 was a "duplicate grievance," based on Plaintiff's previous grievances requesting preservation of the same video—Grievances 4341 and 5661. *Id*. Plaintiff was charged with abuse of the grievance process for violating the Repeat Grievance Policy. *FAC* at 5; *Ex. J to Am. First Ivie Decl*. at 2679.

Plaintiff was found guilty of this violation. The reviewing officer concluded:

> You are receiving formal discipline for abuse of the grievance system. You filed three grievances on the same issue and an additional four "General Issues" requests regarding that same issue [of video preservation]. You were warned to stop doing so by a sergeant, yet you continued to do so….
>
> ….
>
> When we spoke privately, you said the grievances were not regarding the same issue. I reviewed the grievances several times, and I respectfully disagree ….

*Id*. at 2680. Plaintiff was disciplined with four days' loss of privileges, *id*., as well as "punitive isolation," *Pl.'s Stmt. of Undisputed Facts in Supp. of Mot. for Summ. J*., Dkt. 94-1, at 5.

On July 17, 2023, Plaintiff submitted a grievance regarding a public records request. Grievance No. 264972771 ("Grievance 2771") stated: "I'd like to know why none of my public records are even being opened?" *Ex. O to Am. First Ivie Decl*. at 2959. Jail staff responded that inmates are not permitted to submit public information requests while in custody. *Id*.

On November 6, 2026, Plaintiff filed two grievances, Grievance Nos. 384018831 and 384023381 ("Grievance 8831" and "Grievance 3381"), which appear to have been meant as a single, continuous grievance. The grievances raised a number of issues,

MEMORANDUM DECISION AND ORDER - 20

including the repetitive complaint about Plaintiff's discipline for the abusive language he used in Grievance 8131. *Ex. K to Am. First Ivie Decl*. at 2585–86 ("I am punished for using scatology in a grievance ….").

On November 9, 2023, Plaintiff submitted another grievance about public records requests. Grievance No. 388302351 ("Grievance 2351") stated:

> I have a number of freedom of information requests not being forwarded to the front office. I want to know:
>
> 1. Do my FOI requests get reviewed by housing staff prior to forwarding?
>
> 2. Why have many requests sat in the quay [sic] and not even been sent to the office?
>
> 3. I want to know jail policy on handling these requests?
>
> 4. I want the name of each staffer who refused to send my FOI requests [to] the front office?

*Ex. N to Am. First Ivie Decl*. at 2582.

Staff responded to Grievance 2351 as follows:

> Mr. Crist, [t]he jail grievance system is not a correspondence platform for your legal pursuits. Moreover, you filed a grievance [Grievance 2771] on this matter in July. You received a response and did not appeal. Therefore, this issue had been exhausted and, per the inmate Handbook, you are not permitted to file another grievance about it. The policy and practice on how to handle these requests can primarily be found in Idaho Code Title 74. Per the Ada County Sheriff's Office Legal Advisors, they have met the two-hour time given to research and process your requests, which means your requests have exhausted their measure unless you are willing to pay for exceeding the two-hour time limit.

*Id*.

MEMORANDUM DECISION AND ORDER - 21

Deputy Miller reported Plaintiff for violating the Repeat Grievance Policy based on the public information requests in Grievances 2351 and 2771. The charge was also based on other grievances that Miller deemed duplicative, including Grievances 8831 and 3381, which yet again complained of Plaintiff's discipline for the abusive language in Grievance 8131. *Ex. P to Am. First Ivie Decl*. at 2684–89.

Miller's report continued:

> I reviewed jail records and learned Crist has been disciplined twice previously for abuse of the IRF/grievance system. Due to these facts, there was sufficient cause to believe Crist knew repeated inquiries regarding the same issues would result in discipline. While reviewing past grievances and request forms submitted by Crist, I noted he has frequently been warned in staff responses to not repeatedly submit correspondence on the same issues. I located each of the past grievances related to the incidents listed above and confirmed the grievances had been addressed and closed.

*Id*. Plaintiff was found guilty of violating the Repeat Grievance Policy and was subjected to six days' loss of privileges, *id*. at 2686, and "punitive isolation," *Pl.'s Stmt. of Undisputed Facts in Supp. of Mot. for Summ. J*., Dkt. 94-1, at 6. Deputy Barber upheld the disciplinary violation on appeal.[3] *Id*.

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Because Defendants would not bear the burden of proof at trial, Defendants may prevail on their Motion for Summary Judgment simply by "pointing out … that there is

---

[3] The Court previously discussed another disciplinary charge against Plaintiff, in October 2024, for violating the Repeat Grievance Policy—this time with respect to multiple grievances complaining about the shoes issued to jail inmates. *See* Dkt. 37 at 11–13. However, this charge occurred after the filing of the operative complaint in this case and, therefore, is not challenged in that complaint.

MEMORANDUM DECISION AND ORDER - 22

an absence of evidence to support [Plaintiff's] case." *Celotex Corp.*, 477 U.S. at 325. "[I]f a defendant moving for summary judgment has produced enough evidence to require the plaintiff to go beyond his or her pleadings, the plaintiff must counter by producing evidence of his or her own." *Butler*, 370 F.3d at 963.

For the following reasons, the Court concludes that (1) Defendants have met their burden of showing their actions did not violate the First or Fourteenth Amendment, and (2) Plaintiff has not rebutted Defendants' evidence. Therefore, Defendants are entitled to judgment as a matter of law.

1.    **Defendants Are Entitled to Summary Judgment on Claim VII (Due Process Claim)**

Claim VII asserts that the Ada County Jail's practice of disciplining pretrial detainees for violating the Abusive Language Policy and Repeat Grievance Policy deprived Plaintiff of liberty without due process of law.

Because pretrial detainees have not yet been convicted of the crime with which they charged, the Fourteenth Amendment's Due Process Clause prohibits jail conditions that amount to punishment for that crime. *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). Pretrial detainees may, however, be punished for violating jail rules, so long as the detainee is given a hearing at which he may contest the charges. *Mitchell v. Dupnik*, 75 F.3d 517, 524 (9th Cir. 1996).

Defendants have not offered specific argument in their Motion for Summary Judgment with respect to Plaintiff's due process claim, *see generally* Dkt. 91-1, though they do seek summary judgment on "all claims remaining in this case," Dkt. 91. In any

MEMORANDUM DECISION AND ORDER - 23

event, the Court has reviewed the operative pleading, under 28 U.S.C. §§ 1915 and 1915A, and concludes that Claim VII is implausible. *See Iqbal*, 556 U.S. at 678.

The First Amended Complaint itself acknowledges that Plaintiff received hearings on the disciplinary charges that he challenges in this action. *FAC* at 3–6. Accordingly, as a matter of law, Plaintiff received all the process to which he was due. Thus, Claim VII must be dismissed for failure to state a claim upon which relief may be granted.

2.      **Defendants Are Entitled to Summary Judgment on Claim I (Retaliatory Discipline Re: Abusive Language Policy)**

In Claim I, Plaintiff claims that being disciplined for violating Ada County's Abusive Language Policy constituted retaliation in violation of the First Amendment.

Inmates do not forfeit all of their constitutional rights simply because they are detained in jail or incarcerated in prison. Many constitutional rights are appropriately restricted within jail and prison walls, however, and "[l]awful [detention] brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Bell*, 441 U.S. at 545–46 (1979) (internal quotation marks omitted).

In *Turner v. Safley*, 482 U.S. 78 (1987), the U.S. Supreme Court outlined the legal standard governing inmates' First Amendment claims (as well as most other claims) arising from application of a prison regulation or policy. In that case, the Court examined a First Amendment issue in the context of prison officials prohibiting correspondence between inmates incarcerated at different state institutions.

MEMORANDUM DECISION AND ORDER - 24

The *Turner* Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 89. The Court identified four factors to consider when determining whether such a regulation is valid: (1) whether there is a "rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) whether "there are alternative means of exercising the right that remain open to prison inmates"; (3) what "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) whether "ready alternatives" at a "de minimis cost" exist, which "may be evidence that the regulation is not reasonable, but is an exaggerated response to prison concerns." *Id.* at 89–93.

Although *Turner* arose in the prison context, its deferential analysis applies equally to claims brought by pretrial detainees. *See Bull v. City and County of San Francisco,* 595 F.3d 964, 971 (9th Cir. 2010) (en banc). When considering claims of pretrial detainees challenging jail regulations or policies, "courts must defer to the judgment of [jail] officials unless the record contains substantial evidence showing their policies are an unnecessary or unjustified response to problems of jail security." *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 566 U.S. 318, 322–23 (2012).

The *Turner* analysis appropriately allows substantial leeway in the management of jails and prisons because "[s]ubjecting the day-to-day judgments of [jail and] prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems

MEMORANDUM DECISION AND ORDER - 25

of [jail or] prison administration." *Turner*, 482 U.S. at 89. Such officials "bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them," *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003), and courts must apply the *Turner* test in a way that "accord[s] great deference to [those] officials' assessments of their interests," *Michenfelder v. Sumner*, 860 F.2d 328, 331 (9th Cir. 1988).

Courts have previously found that jails have many legitimate penological goals. Such goals include "operating the institution in a manageable fashion," *Bell*, 441 U.S. at 540; ensuring the safety of inmates and jail staff, *Bull,* 595 F.3d at 974 n.10; safeguarding jail employees' morale so as to promote proper jail management, *Ward v. Dyke*, 58 F.3d 271, 274 (6th Cir. 1995); and protecting jail employees, *Cal. Coal. for Women Prisoners v. United States*, 723 F. Supp. 3d 712, 745 (N.D. Cal. 2024). Jails also have important penological interests in "maintaining institutional security and preserving internal order and discipline."[4] *Bell*, 441 U.S. at 546. Though pretrial detainees have not yet been convicted of the crime charged, they pose no "lesser security risk than convicted inmates." *Id*. at 546 n.28. "Indeed, it may be that in certain circumstances they present a greater risk …." *Id*.

The First Amendment includes the right to be free from retaliation for exercising constitutional rights. An inmate asserting a retaliation claim must show the following:

---

[4] Based on its review of case law, the Court rejects Plaintiff's contention that a jail's *only* legitimate interests are institutional order, safety, and security. *See generally Memo. in Opp. to Def. Mot. Summ. J.*, Dkt. 96.

(1) "a state actor took some adverse action" against the inmate; (2) the defendant took that adverse action "because of" the inmate's exercise of protected conduct; (3) the adverse action "chilled the inmate's exercise" of protected conduct; and (4) the action "did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567–68 (9th Cir. 2005).

Because a retaliatory motive on the part of a defendant is an element of a retaliation claim, a defendant who is merely negligent in engaging in an adverse action against an inmate is not liable under § 1983. Further, "bare allegations" of a retaliatory motive are insufficient to support a retaliation claim. *Rizzo v. Dawson*, 778 F.2d 527, 532 n.4 (9th Cir. 1985); *see also Wood v. Yordy*, 753 F.3d 899, 905 (9th Cir. 2014) ("We have repeatedly held that mere speculation that defendants acted out of retaliation is not sufficient."). Rather, when analyzing a prison or jail official's proffered reasons for allegedly retaliatory conduct, the Court must "afford appropriate deference and flexibility" to that official. *Pratt v. Rowland*, 65 F.3d 802, 807 (9th Cir. 1995) (internal quotation marks omitted).

Using a jail or prison grievance process to submit a nonfrivolous grievance is generally considered protected conduct because it constitutes an exercise of an inmate's First Amendment right to petition the government for redress. *Bradley v. Hall*, 64 F.3d 1276, 1279 (9th Cir. 1995), *abrogated on other grounds by Shaw v. Murphy*, 532 U.S. 223, 230 n.2 (2001). Specifically, jail officials may not discipline inmates "merely for using 'hostile, sexual, abusive or threatening' language in a written grievance." *Brodheim v. Cry*, 584 F.3d 1262, 1282 (9th Cir. 2009).

MEMORANDUM DECISION AND ORDER - 27

But the right to use disrespectful or abusive language is not unqualified. *See Bell*, 441 U.S. at 545 ("[S]imply because prison inmates retain certain constitutional rights does not mean that these rights are not subject to restrictions and limitations."). Though an inmate has a right to file grievances, he may not "exercise that right in a manner that violates legitimate [jail] regulations or penological objectives." *Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001). That is, an inmate may be disciplined for using disrespectful or abusive language in a grievance, so long as the discipline is reasonably related to a legitimate governmental interest. *Turner*, 482 U.S. at 89.

Writings by inmates—even if submitted as part of a jail grievance process—are not protected by the First Amendment if they do not "present a legitimate issue or seek a legitimate resolution of that issue[,] regardless of the language used." *Williams v. Fox*, No. 22-36014, 2025 WL 1419903, at *2 (9th Cir. May 16, 2025) (unpublished) (internal quotation marks and alteration omitted). For example, filing a frivolous grievance is not protected conduct. *Jones v. Williams*, 791 F.3d 1023, 1035 (9th Cir. 2015) ("Prisoners' grievances, *unless frivolous* …, concerning the conditions in which they are being confined are deemed petitions for redress of grievances and thus are protected by the First Amendment.") (emphasis added) (quoting *Hasan v. U.S. Dep't of Labor*, 400 F.3d 1001, 1005 (7th Cir. 2005)) (alteration in original); *see also Williams v. Fox*, 2025 WL 1419903, at *2 (upholding judgment in favor of defendant on prisoner's First Amendment claim in part because that amendment "protects only nonfrivolous grievances").

MEMORANDUM DECISION AND ORDER - 28

Similarly, "grievances that are nothing more than a string of insults do not constitute substantive grievances" and, therefore, are not protected by the First Amendment. *Williams v. Stewart*, No. 1:18-cv-00343-DCN, 2019 WL 13241679, *4 n.2 (D. Idaho April 15, 2019) (unpublished). Filing grievances that are intended solely "to harass" jail staff, "rather than designed to lead to any practical result," also does not constitute protected conduct and may properly be grounds for jail discipline. *Debarr v. Clark*, 648 F. App'x 706, 708 (9th Cir. April 18, 2016) (unpublished). Unprotected writings also include grievances that are vexatious or duplicative. *Id*.

Moreover, because negligence is insufficient to support a retaliation claim under § 1983, a jail official who disciplines an inmate for submitting a frivolous, vexatious, or duplicative grievance has not violated the First Amendment if that official subjectively—even if mistakenly—believed the grievance was frivolous, vexatious, or duplicative. In other words, an official who only *should* have known a grievance presented a legitimate issue has not violated the First Amendment in disciplining an inmate for submitting the grievances. *See Daniels v. Williams*, 474 U.S. 327, 332 (1986) (stating that negligence is not actionable under § 1983 because a negligent act by a public official is not an abuse of governmental power but merely a "failure to measure up to the conduct of a reasonable person").

Not every retaliatory act taken by an official can be considered an adverse action that chills the exercise of protected speech. The proper inquiry asks whether the official's action "would chill or silence a person of ordinary firmness from future First Amendment activities." *Mendocino Envt'l Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1300 (9th Cir.

1999) (internal quotation marks omitted). If it would not, then "the retaliatory act is simply *de minimis* and therefore outside the ambit of constitutional protection." *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003) (internal quotation marks omitted). *See also Morris v. Powell*, 449 F.3d 682, 686 (5th Cir. 2006) ("The [*de minimis*] standard achieves the proper balance between the need to recognize valid retaliation claims and the danger of federal courts embroiling themselves in every disciplinary act that occurs in state penal institutions.") (internal quotation marks and alteration omitted).

A plaintiff asserting a retaliation claim under § 1983 also "must show a causal connection between a defendant's retaliatory animus and [the plaintiff's] subsequent injury." *Hartman v. Moore*, 547 U.S. 250, 259 (2006) (*Bivens* action). Retaliatory motivation is not established simply by showing an adverse action by the defendant *after* protected speech. Instead, the plaintiff must show a nexus between the two. *Huskey v. City of San Jose*, 204 F.3d 893, 899 (9th Cir. 2000).

Finally, even if an inmate establishes that his protected conduct was the cause of an adverse action by a jail official, the inmate's retaliation claim fails so long as the official's conduct also reasonably advanced a legitimate governmental interest. *See Turner*, 482 U.S. at 89. The "plaintiff bears the burden of pleading and proving the absence of legitimate correctional goals for the conduct of which he complains." *Pratt*, 65 F.3d at 806.

### A.    Because Grievance 8131 Did Not Present a Legitimate Issue or Seek a Legitimate Resolution, It Was Not Protected by the First Amendment

Plaintiff alleges that the writing including the abusive language for which he was disciplined, Grievance 8131, was protected conduct. Whether the writing was grieving a legitimate issue or was intended merely to harass, insult, or abuse staff and to vent Plaintiff's frustration determines whether Defendants were permitted to discipline Plaintiff for abusive language in the grievance.

Plaintiff argues that using the abusive language in Grievance 8131 was protected conduct because it served to exhaust a separate medical treatment claim, *Memo. in Opp.* at 1–2, which Plaintiff is currently litigating in another case. *See Crist v. Clive*, No. 1:25-cv-00258-REP (D. Idaho, filed May 15, 2025) (Case 258). But Defendants point to evidence that Plaintiff had already grieved the allegedly unconstitutional treatment for his shoulder injury provided by Clive and other medical providers four times. *Ex. R to Third Declaration of Justin Ivie ("Third Ivie Decl.")*, Dkt. 99-1, Bates No. Ada County 2872, 2885, 2894, 2896–97. One of these four prior grievances served to exhaust the administrative grievance system to permit Plaintiff to file a civil rights lawsuit on that subject. Case 258 was filed on May 9, 2025 (mailbox rule). *See* Case 258, Dkt. 3. Grievance 8131 is not relevant to any exhaustion issues in Case 258. Grievance 8131 did not suggest a resolution as required by the Grievance Policy, nor did it identify any particular relief Plaintiff was seeking.

Plaintiff also admits that he used the grievance simply to "vent," rather than to seek resolution of a legitimate issue. *See Ex. D to Am. First Ivie Decl.* at 2611; *Ex. E to*

*Am. First Ivie Decl.* at 3331; *First Crist Decl.*, ¶ 12. This admission places the non-legitimate nature of Grievance 8131 beyond debate. A fifth grievance that was merely a "string of insults" was unnecessary. *Williams v. Stewart*, 2019 WL 13241679, *4 n.2.

For all of the foregoing reasons, the record contains sufficient undisputed facts showing that Plaintiff was not grieving a legitimate issue in Grievance 8131, but that he was merely insulting and abusing staff and venting his frustration, without suggesting a solution to his "grievance." Therefore, Defendants have shown that Grievance 8131 was not protected conduct, and Plaintiff's insulting and abusive language that jail staff were "pieces of shit" could be punished consistently with the Constitution. *Ex. B to Am. First Ivie Decl.*

The burden thus shifts to Plaintiff to produce evidence suggesting the grievance presented a legitimate issue for resolution, rather than representing a mere attempt to maliciously insult, vex, or abuse jail staff or jail medical providers. Plaintiff has failed to do so.

Before he submitted Grievance 8131, Plaintiff had already grieved essentially the same medical issues four previous times. He has not shown that any new issue or claim was included in Grievance 8131. Simply asserting that one is exhausting administrative remedies—when that has already been done—does not insulate one from jail staff finding that the grievance was not legitimate and, therefore, not subject to First Amendment protection.

More importantly, Plaintiff's argument does not rebut Defendants' evidence that Grievance 8131 did not present a legitimate issue or seek a legitimate resolution,

MEMORANDUM DECISION AND ORDER - 32

regardless of the language Plaintiff used in the grievance. *See Williams v. Fox*, 2025 WL 1419903, at *2. Grievance 8131 speaks for itself, and it is clear from the face of that grievance that Plaintiff was merely upset with and abusing jail staff, rather than identifying a legitimate, nonfrivolous concern.

Showing that the written communication for which Plaintiff was disciplined presented a legitimate issue or sought a legitimate resolution to that issue—and not merely a string of insults or something similar—is a required element of Plaintiff's claim that he was retaliated against for exercising protected conduct. *See Jones*, 791 F.3d at 1035; *Williams v. Fox*, 2025 WL 1419903, at *2; *Williams v. Stewart*, 2019 WL 13241679, *4 n.2; *Debarr*, 648 F. App'x at 708. Because Defendants' evidence has established that Grievance 8131 did not present a legitimate issue or seek a legitimate resolution, and because Plaintiff has not rebutted that evidence, the Court concludes as a matter of law that the grievance was not protected by the First Amendment. As a result, Claim I fails as a matter of law.

Summary judgment as to Claim I will be granted to Ada County on this basis.

### B. *The Abusive Language Policy Is Reasonably Related to the Legitimate Penological Interests in Promoting the Morale, Mental Health, and Retention of Jail Staff, as well as the Legitimate Interest in Inmate Rehabilitation*

Defendants assert that, even if Grievance 8131 had constituted protected conduct, Defendants are still entitled to summary judgment on Plaintiff's retaliation claims because the Abusive Language Policy is reasonably related to legitimate government interests and, thus, satisfies the *Turner* test.

MEMORANDUM DECISION AND ORDER - 33

Defendants argue that one of the legitimate interests advanced by the Abusive Language Policy is that of institutional order, safety, and security. Ninth Circuit law differs from that of most other courts on this issue.

In *Brodheim*, the Ninth Circuit held that the officer's warning to an inmate that he should be careful what he writes in a grievance "cannot escape constitutional scrutiny by citing a legitimate penological interest" in "security and discipline." 584 F.3d at 1266, 1273. *Brodheim* relied on *Bradley*, 64 F.3d at 1281–82, which held that "prison officials may not punish an inmate merely for using 'hostile, sexual, abusive or threatening' language in a written grievance." Because "disrespectful language in a prisoner's grievance is itself protected activity under the First Amendment," the Ninth Circuit reasoned, "[i]t is thus undisputed that the warning was motivated by [the plaintiff's] protected conduct," and a genuine dispute of material fact existed as to the retaliation claim. *Brodheim*, 584 F.3d at 1271.

Other courts have not accepted *Brodheim*'s reasoning and conclusion. *In Peterson v. Wrenn*, No. 14-CV-432-LM, 2017 WL 401189 (D.N.H. Jan. 30, 2017), the court rejected the *Brodheim* holding and observed:

> Courts in other jurisdictions have concluded that inmates who inject libels and insults in grievance forms can be sanctioned for using disrespectful language. *See, e.g., Hale v. Scott*, 371 F.3d 917, 918 (7th Cir. 2004) (inclusion of libelous rumor of guard's sexual misconduct, in context of grievance on unrelated issue regarding that guard, was not protected speech); *Parker v. Chavis*, No. 1:08–CV–416, 2010 U.S. Dist. LEXIS 100190, at *8, *10, 2010 WL 3787898, at *3, *4 (M.D.N.C. Sept. 21, 2010) (inmate's First Amendment rights were not violated when he was subjected to disciplinary proceedings for calling officer a "jerk" in grievance, as "[t]he

MEMORANDUM DECISION AND ORDER - 34

purpose of the prison grievance procedure is to bring issues to the attention of prison officials, not to make offensive or disparaging remarks about individuals, nor to air personal or petty opinions and disagreements"), *R&R approved*, No. 1:08–CV–416 (M.D.N.C. Mar. 7, 2011) (ECF No. 27). *Cf. Roberts v. Jones*, No. CIV–11–143–M, 2012 U.S. Dist. LEXIS 45106, at *10, 2012 WL 1072218, at *2 (W.D. Okla. Feb. 29, 2012) (qualified immunity defense was available to prison officials who subjected inmate to disciplinary proceedings for using disrespectful language in grievances, as Ninth Circuit case law did not bind court in Tenth Circuit), *R&R approved*, No. CIV–11–143–M, 2012 U.S. Dist. LEXIS 45132, 2012 WL 1142514 (W.D. Okla. Mar. 30, 2012).

*Id*. at *9.

Defendants urge the Court to find likewise with respect to Ada County Jail's legitimate interests in safety and security. However, this Court is constrained by Ninth Circuit law, and, absent a way to distinguish *Brodheim*, cannot contravene that precedent even if the Court disagrees with it.[5] That is a matter for Defendants to present to the Ninth Circuit Court of Appeals.

---

[5] If the Court were not bound by *Brodheim*, it would conclude that the Abusive Language Policy is reasonably related to the legitimate jail interest in ensuring institutional order, security, and safety. As one court, relying on expert testimony, has noted:

> [T]hese rules [against abusive language directed as prison staff] help to protect safety, security, and order within the prison by preventing confrontations. Corrections staff need to be able to maintain a high degree of self-control which can be undermined when incarcerated individuals bait them with insults. Confrontations can be caused by the use of abusive and harassing language…. It is imperative that order and calm be maintained and that confrontational situations be avoided in the prison setting…. Confrontation can lead to violence. The reason of preventing confrontations too cannot be addressed simply by having someone who is not the target of the insults respond to the grievance. Prisoners often talk up their grievances to other incarcerated individuals so the contents of an offensive grievance can easily get around the prison. Incarcerated

MEMORANDUM DECISION AND ORDER - 35

However, *Brodheim* considered only whether disciplining an inmate for abusive language in a grievance was reasonably related to the legitimate interests in jail safety and security. It did not address other legitimate penological goals that might be advanced by such a policy. Nor did *Bradley*, which primarily addressed "security concerns" and the penological interest in "peaceable operation" of the institution. 64 F.3d at 1281. Thus, the Court must now consider whether the Abusive Language Policy is reasonably related to other legitimate jail interests.

The first *Turner* factor is whether there is a rational connection between the Abusive Language Policy and the legitimate penological interest asserted. *Turner*, 482 U.S. at 89. The jail unquestionably has legitimate interests in "promoting a non-hostile work environment" for jail staff, *Reynolds v. Quiros*, 25 F.4th 72, 85 (2d Cir. 2022), and in ensuring the morale of jail employees, *Cal. Coal. for Women Prisoners*, 723 F. Supp. 3d at 745.

The jail also has a legitimate interest in safeguarding the mental health of jail employees, who should not have to be threatened, harassed, or abused at work. *Cal. Coal. for Women Prisoners*, 723 F. Supp. 3d at 745 ("It is beyond dispute that the government's goal[]—*to protect staff …*—[is] legitimate.") (emphasis added). The jail has an additional

---

individuals also often file their grievances in court so it is not possible to always shield the targeted employees from these remarks.

*Richey v. Duncan*, No. 2:23-CV-00050-SAB, 2024 WL 3432363, at *6 (E.D. Wash. July 16, 2024) (unpublished).

MEMORANDUM DECISION AND ORDER - 36

legitimate interest in ensuring the retention of competent employees, which helps to ensure professionalism in jail staff.

Defendants have submitted evidence that "[h]arassing language directed at staff can damage morale." *First Am. Ivie Decl.* ¶ 7. Disciplining inmates for abusive name-calling in a grievance, particularly where the grievance also presents no legitimate issue for resolution, is rationally connected to the legitimate penological interest in preventing inmate behavior that may "worsen staff morale" or that may cause jail employees to suffer emotional trauma or to leave their jobs. *Cal. Coal. for Women Prisoners*, 723 F. Supp. 3d at 745. Additionally, disciplining an inmate "who is interfering with … staff morale goes to the essence of [jail] management." *Ward v. Dyke*, 58 F.3d 271, 274 (6th Cir. 1995) (transfer of inmate to preserve morale); *see also Hadden v. Howard*, 713 F.2d 1003, 1006–07 (3d Cir. 1983) ("If it is possible for inmates maliciously to lie and maliciously to show disrespect toward prison staff members, merely by doing so within the context of filing an inmate complaint, then serious problems of staff morale and prison discipline may reasonably be expected to arise.").

As for the second *Turner* factor, Plaintiff had an obvious alternative means of exercising his right to petition the government for redress—he could simply have omitted the insulting and abusive name-calling. Plaintiff himself acknowledged at least twice in different communications to Defendants that he could have done so. *Ex. D to Am. First Ivie Decl.* at 2611; *Ex. E to Am. First Ivie Decl.* at 3331.

The Court also considers the impact that permitting insulting and abusive language by inmates would have. *Turner*, 482 U.S. at 90. Though it does not appear that other

MEMORANDUM DECISION AND ORDER - 37

inmates would necessarily be affected, jail staff certainly would. As the Court explained above with respect to the first *Turner* factor, permitting such language would worsen employee morale, mental health, and retention.

The fourth *Turner* factor also weighs in favor of upholding the constitutionality of the Abusive Language Policy. Though permitting such language is a ready alternative to prohibiting it, the cost of doing so—once again in terms of staff morale, mental health, and retention—would be more than de minimis. *See Turner*, 482 U.S. at 90–91 ("[O]fficials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint.").

For these reasons, Defendants have met their burden of establishing that the Abusive Language Policy is reasonably related to the legitimate jail interests in promoting staff morale, mental health, and retention.

Defendants also assert that the Abusive Language Policy is reasonably related to the legitimate jail interest in inmate rehabilitation. If Plaintiff had been a convicted inmate at the time he was disciplined, this argument would undoubtedly be persuasive.

But it is not entirely clear whether the Ninth Circuit views rehabilitation as a legitimate penological goal with respect to pretrial detainees, at least in a jail that houses both detainees and convicted inmates. The circuit has implied several times that rehabilitation is not a legitimate interest when applied to pretrial detainees, who have not yet been convicted of the crime charged. *See Bull,* 595 F.3d at 974 n.10 ("While penological interests in punishment or rehabilitation may not be applicable outside of a prison setting, the penological interest in security and safety is applicable in all correction

MEMORANDUM DECISION AND ORDER - 38

facilities."); *United States v. Hearst*, 563 F.2d 1331, 1345 n.11 (9th Cir. 1977) ("[A] pretrial detainee may assert his status as a shield against intrusive practices aimed solely at rehabilitation ...."). In *Mauro v. Arpaio*, however, the en banc Ninth Circuit upheld a jail regulation (which prohibited inmates from possessing nude images) based largely on the jail's interest in promoting inmate rehabilitation. 188 F.3d 1054, 1059–63 (9th Cir. 1999) (en banc), *cert. denied*, 519 U.S. 1018 (March 20, 2000).

The court in *Mauro* stated unequivocally that "both jail security *and rehabilitation* are legitimate penological interests." *Id*. at 1059 (emphasis added). The circuit did go on to note that "rehabilitation is a legitimate goal only to the extent that it applies to the convicted inmates housed at the jail" and "is not a legitimate goal to the extent that the jail is attempting to impose rehabilitation on the pretrial detainees housed at the jail." *Id*. at 1059 n. 1. Nonetheless, the *Mauro* court was unbothered by this distinction because the jail in that case housed "a mix of pretrial detainees and convicted inmates." *Id*.

The Court reads *Mauro* as holding that inmate rehabilitation is a legitimate jail interest as applied to pretrial detainees *if* the jail houses both detainees and inmates serving a criminal sentence. Because the Ada County Jail houses such a mix of inmates, the County has a legitimate interest in promoting rehabilitation of its inmates. *See Third Ivie Decl*. ¶ 3 ("The Ada County jail houses a mix of pretrial detainees and those who have been convicted of a crime and are in the process of serving their sentence."). As Defendants' evidence shows:

> All inmates at the Ada County Jail live together based on classification without any distinction of who is a pretrial

> detainee or not. Pretrial detainees live alongside those who
> are convicted and serving a sentence.
>
> ….
>
> The Jail is not capable of having different sets of rules for the
> different types of inmates living in the same classification,
> such as different standards for respectful language used in a
> grievance depending on whether the inmate is a pretrial
> detainee or not.

*Id*. ¶¶ 5, 7.

And there is an obvious reasonable relationship between the Abusive Language Policy and the jail's interest in inmate rehabilitation. Defendants accurately point out that teaching inmates to resolve conflict respectfully and in a non-hostile manner can foster effective communication and can help them in their job searches outside of jail. *See Memo. in Supp. of Def. Mot. Summ. J.*, Dkt. 91-1 at 10. The Court agrees that prohibiting abusive language directed at jail staff is reasonably related to the legitimate interest "in reinforcing positive communication and discouraging disrespectful or hostile behavior." *Third Ivie Decl*. ¶ 25.

Just as *Brodheim* did not address staff morale, mental health, and retention, it similarly did not address rehabilitation as a legitimate penological interest. Further, although *Bradley* held that the legitimate penological interest in rehabilitation was "overshadowed" by a prisoner's right to file a grievance containing disrespectful language, 64 F.3d at 1281, the Supreme Court overruled this "overshadowing" balancing test in *Shaw*, 532 U.S. at 230 n.2.

MEMORANDUM DECISION AND ORDER - 40

Distinguishing *Brodheim*, the U.S. District Court for the Eastern District of Washington has approved of a policy similar to Ada County's Abusive Language Policy. *Richey v. Duncan*, No. 2:23-CV-00050-SAB, 2024 WL 3432363, at *6 (E.D. Wash. July 16, 2024) (unpublished). In *Richey*, the court recognized that the defendants presented "what they believe are legitimate penological interests for the restriction of abusive language that go beyond what was presented in *Brodheim*." *Id.* at *5.

Quoting a prison official with "thirty-six years of real-world experience," the *Richey* court explained the following factors supporting its conclusion that the policy prohibiting abusive language was reasonably related to the legitimate jail interests in rehabilitating inmates and in preserving employee morale:

> Individuals who become incarcerated often have difficulty dealing with interactions with others. Many of them have never had the opportunity in life to learn respectful discourse or the personal discipline to follow rules. Part of the goal of incarceration is to teach incarcerated people respectful and effective communication skills so that they may someday be able to participate in society…. Regardless of who reads the grievances, the behavior is negative and it is imperative that the Department be permitted to reinforce new habits of respectful behavior and to punish negative behavior as part of the rehabilitation process.
>
> In addition, many incarcerated individuals ended up in prison because they lacked respect for rules in general and for authority figures. Respect for rules and being respectful of authority is not just a skill needed in prison, it is part of the life skills a person needs to function in everyday life outside of a prison as well. Allowing an incarcerated person to ignore prison rules when they file grievances and to use harassing and abusing language discourages respect for authority. This is also something that cannot be solved by having someone who is not the target of the harassment read the grievances.

MEMORANDUM DECISION AND ORDER - 41

> …. Staff morale also suffers as the result of being harassed in the workplace…. Prison should be a place of respectful interactions and it should be a safe environment for all.

*Id.* at *5–6.

The Court finds persuasive the *Richey* court's distinguishing of the facts of that case from *Brodheim* and its analysis regarding the connection between prohibiting abusive language and inmate rehabilitation, as well as protecting the morale and well-being of jail employees.

Each of the interests identified in *Richey* applies with equal force to the Ada County Jail. Defendants' evidence establishes the following:

> The Jail strives to support and equip inmates with the social and conflict-resolution skills necessary to foster and develop prosocial behaviors and attitudes that make former inmates productive members of society, compliant probationers and parolees, and desirable neighbors and community members, as well as to encourage lower recidivism. Using respectful language builds empathy, an important characteristic and mindset for combating criminal and anti-social thinking patterns. The Jail has a penological interest in reinforcing positive communication and discouraging disrespectful or hostile behavior.
>
> Enforcing these rules also promotes respect for authority and compliance with lawful directives. Many individuals are in custody because they previously failed to follow rules or respect authority figures. Permitting inmates to use harassing language toward staff in grievances would erode the expectation of respect for rules and authority figures, which is necessary both in custody and in the community. Requiring respectful language in written grievances imposes the same rules an employer or supervisor in the community would require in professional communications.

*Am. First Ivie Decl.* ¶¶ 25–29.

MEMORANDUM DECISION AND ORDER - 42

It appears the Ninth Circuit has not squarely addressed whether, considering only the *Turner* factors as the Supreme Court has instructed, a jail regulation like the Abusive Language Policy is reasonably related to preserving the morale, mental health, and retention of jail staff or to promoting inmate rehabilitation. Today, this Court concludes Defendants have met their burden of establishing that such goals are legitimate and necessary. Defendants have also shown that prohibiting abusive language in the course of the grievance process is reasonably related to those interests.

The burden thus shifts to Plaintiff to establish a genuine dispute of material fact as to whether, under *Turner*, the Abusive Language Policy is reasonably related to legitimate jail interests. He has not done so.

Plaintiff asserts that, as a pretrial detainee, prison officials had no right to subject him to rehabilitation. The Court has already explained why, under Ninth Circuit precedent, such an interest is legitimate when a jail houses both pretrial detainees and convicted inmates, as the Ada County Jail does. *See Mauro*, 188 F.3d at 1059–63.

Plaintiff also alleges that the jail has changed its policy and no longer prohibits disrespectful or abusive language in grievances. According to Plaintiff, this change "supports the position that the [Abusive Language] [P]olicy 'was an exaggerated and unwarranted response' to jail security" problems. *Memo. in Opp. to Def. Mot. Summ. J.*, Dkt. 96, at 6 (quoting *Shorter v. Baca*, 895 F.3d 1176, 1188 (9th Cir. 2018)).

Contrary to Plaintiff's argument, however, later changes in policy cannot be considered as evidence that the prior policy was unconstitutional. *See Rosa v. Taser Int'l, Inc.*, 684 F.3d 941, 948 (9th Cir. 2012) ("Because [a subsequent remedial measure] is not

MEMORANDUM DECISION AND ORDER - 43

admissible to establish what was knowable [at the time of the events giving rise to plaintiffs' claims], it cannot aid the [plaintiffs] in avoiding summary judgment.") (citing Fed. R. Evid. 407, which renders evidence of subsequent remedial measures inadmissible). Though the court in *Shorter* stated that a change in policy supported a conclusion that the former policy did not meet the *Turner* test, jail officials in that case had already "admitted that … their practice … did not serve any legitimate purpose." 895 F.3d at 1188 (9th Cir. 2018). Thus, this portion of *Shorter* is dicta.

Further, even if Ada County's change in policy could be considered on summary judgment, there is no evidence that the change occurred because the Abusive Language Policy was unconstitutional or otherwise improper. Plaintiff merely expresses his own belief, unsupported by any evidence, that Ada County must have changed the policy only because it had been an exaggerated response to the penological concerns discussed above.

Because Plaintiff has failed to controvert Defendants' evidence that the Abusive Language Policy is reasonably related to legitimate governmental interests, Ada County is entitled to summary judgment on Claim I on this basis as well.

**3.    Defendants Are Entitled to Summary Judgment on Claims II and III (Retaliatory Discipline Re: Repeat Grievance Policy)**

Claims II and III allege that Plaintiff was deprived of his First Amendment right to be free from retaliation when he was twice charged with violating the Repeat Grievance

MEMORANDUM DECISION AND ORDER - 44

Policy. Claim II is asserted against the individual Defendants, while Claim III is asserted against Ada County.[6]

This Court has previously held that "a jail has a legitimate interest in managing staff resources, including ensuring that staff is not overly burdened and required to take too much time away from their primary function—assuring the safety of those in the jail—to respond to grievances." *See* Dkt. 37 at 14. Though that ruling was in the context of a request for preliminary injunctive relief, the additional evidence presented on summary judgment in this case only confirms the legitimacy of that interest.

Defendants have submitted evidence that the Repeat Grievance Policy is rationally connected to the legitimate interest in preserving jail resources for staff's most important responsibilities. Allowing multiple grievances on the same issue "would burden staff resources, interfere with Jail operations, and reduce the effectiveness of the grievance system." *Am. First Ivie Decl.* ¶ 31. Specifically, a sheriff's deputy "must respond to each grievance," which takes those deputies away from their primary duties of maintaining institutional order and ensuring the security and safety of inmates and staff. Indeed, the jail "has finite resources to perform all [such] necessary duties." *Id*. As a result, prohibiting multiple grievances on the same issue is rationally connected to ensuring the

---

[6] Plaintiff's assertion that Defendants have not argued Claims II or III in their summary judgment motion, *see Memo in Opp. to Def. Mot. Summ. J.* at 1–2, is inaccurate. Though Defendants have not specifically referred to Plaintiff's claims by identifying numbers in their summary judgment briefing, that briefing plainly discusses Plaintiff's retaliation claims based on the Repeat Grievance Policy. *See generally Memo. in Supp. of Def. Mot. Summ. J.*, Dkt. 91-1.

MEMORANDUM DECISION AND ORDER - 45

safe, secure, and orderly functioning of the jail by allocating resources in a reasonable manner.

Inmates also have an alternative means of bringing a concern to jail officials—they can simply submit a single grievance raising that concern. This fully satisfies the inmates' right to petition the government for redress, while also preserving the jail's resources by not requiring jail staff to waste resources addressing inmate concerns that have already been fully exhausted.

Defendants have also shown that permitting repeat grievances would negatively impact inmates and jail staff by directing staff members' time and attention away from core responsibilities like safety and security, and toward a futile exercise of dealing with an inmate grievance that has already been fully grieved. In a one-year period, Ada County Jail inmates submitted more than 3,000 grievances. *Decl. of Shem McCulloch*, Dkt. 32-2, ¶¶ 13–14. The Repeat Grievance Policy preserves jail resources by prohibiting inmates from filing even more grievances—those that are duplicative. Thus, the first three *Turner* factors weigh in favor of upholding the constitutionality of the Repeat Grievance Policy.

The Court also concludes that the Repeat Grievance Policy was not an exaggerated response to the jail's concerns as set forth in the fourth *Turner* factor. Like the Abusive Language Policy, the Repeat Grievance Policy has since been withdrawn. But, as explained previously, that fact is inadmissible to establish the unconstitutionality of the Repeat Grievance Policy, and no other evidence suggests that the policy was an improper means of achieving the jails' legitimate goals.

MEMORANDUM DECISION AND ORDER - 46

The Court concludes Defendants have shown that the Repeat Grievance Policy is reasonably related to the legitimate penological interest in preserving jail resources and institutional order, safety, and security. Specifically, the policy helps to "direct [the jail's] finite resources toward the core functions of the jail while providing an avenue for inmates to raise a legitimate issue and seek a legitimate resolution." *Am. First Ivie Decl*. ¶ 31.

Plaintiff has not met his burden of showing a genuine dispute of material fact as to whether the Repeat Grievance Policy satisfies the *Turner* test. Plaintiff correctly notes that, under the PLRA, inmates must exhaust administrative remedies before filing a lawsuit challenging prison or jail conditions. *See* 42 U.S.C. § 1997e(a). However, this does not mean that inmates must be permitted to file multiple grievances on the same issue. The Repeat Grievance Policy expressly states that discipline for repetitive grievances is permitted only *after* the issue has already been fully exhausted in a previous grievance. Thus, Plaintiff has failed to establish a genuine dispute of material fact as to whether the PLRA's exhaustion requirement negates the reasonable relationship between the Repeat Grievance Policy and the jail's legitimate interests. It does not.

Plaintiff also argues that the grievances for which he was punished did not, in fact, raise the same issue. Therefore, Plaintiff asserts, he did not actually violate the Repeat Grievance Policy and was unlawfully disciplined. The evidence does not support Plaintiff's contention.

MEMORANDUM DECISION AND ORDER - 47

First, Plaintiff's multiple grievances about video preservation involved a specific video of a specific assault. These repetitive grievances about the video were obviously duplicative and were not raising separate concerns.

Second, Plaintiff's repeated complaints about being disciplined under the Abusive Language Policy involved only his discipline with respect to Grievance 8131. Again, this is a single issue that Plaintiff grieved multiple times.

Third, as for Plaintiff's grievances with respect to his public records requests, Plaintiff states he had more than one such request pending and that the two grievances were related to two different issues. But Grievance 2351—which subjected Plaintiff to discipline under the Repeat Grievance Policy—did not say anything about the particular requests Plaintiff was grieving. He merely referred to his previous "freedom of information requests." *Ex. N to Am. First Ivie Decl.* at 2582. Responding jail staff had no way of knowing that Grievance 2351 and the previous public information grievance, Grievance 2771, might have involved different issues.

Accordingly, even if Plaintiff is correct that he did not intend the grievances to be duplicative, he has not established that Defendants intentionally retaliated against Plaintiff. Instead, the "obvious alternative explanation," *Iqbal*, 556 U.S. at 682, is that Defendants mistakenly (or, at most, negligently) believed the grievances were duplicative. This is not enough to establish liability under § 1983. *See Daniels*, 474 U.S. at 332 (negligence is insufficient for a § 1983 claim); *Rhodes*, 408 F.3d at 567 (retaliatory motive is a required element of a retaliation claim).

MEMORANDUM DECISION AND ORDER - 48

Relying on *Brodheim*, Plaintiff also asserts that jail resources would not be drained by allowing inmates to present repeat grievances. Plaintiff contends that the jail's grievance coordinator deals with the grievance process and that the coordinator has "no daily security duties." *Memo. in Opp. to Def. Mot. Summ. J.*, Dkt. 96-2, at 3. But Plaintiff does not support this conclusory allegation with any evidence. His subjective belief that the employees involved in the grievance process have no safety or security responsibilities is not enough. Plaintiff has certainly not rebutted Defendants' evidence that it is the sheriff's deputies—*not* the grievance coordinator—who must respond to inmate grievances. The grievance coordinator manages the logistics of the grievance process, but the deputies must actually investigate the concerns and draft the responses. And *Brodheim* did not address whether a policy like Ada County's Repeat Grievance Policy was reasonably related to a legitimate penological interest.

Plaintiff also argues that the Repeat Grievance Policy does not reasonably advance legitimate jail interests because the policy was intended to "prevent[] judicial review of internal jail conduct" and was "designed to silent legitimate cries for help." *Memo. in Opp. to Def. Mot. Summ. J.* at 4–5. Again, Plaintiff has submitted no evidence to support his allegation that Defendants acted with an illegal intent, and he has not controverted Defendants' evidence that the Repeat Grievance Policy was intended to promote the effectiveness of the grievance process, to preserve finite jail resources, and to ensure the smooth daily maintenance of jail operations. *Am. First Ivie Decl.* ¶ 31. A prisoner needs to file only one grievance and may then proceed to court, showing that the Repeat Grievance Policy was not, in fact, designed to silent legitimate cries for help but, instead,

MEMORANDUM DECISION AND ORDER - 49

permitted such prisoners to proceed speedily to court after one complete round of exhaustion.

Finally, Plaintiff claims that the Repeat Grievance Policy is unconstitutionally vague. *Memo. in Supp. of Pl. Mot. Summ. J.*, Dkt. 94-3, at 16. Plaintiff did not raise this void-for-vagueness challenge in his operative complaint, and he may not do so now.

Showing that there is no reasonable relationship between the grievance policy and legitimate governmental interests is a required element of Plaintiff's claim that he was retaliated against for submitting multiple grievances. Because Defendants have established that the Repeat Grievance Policy is reasonably related to legitimate jail interests under *Turner*, and because Plaintiff has not rebutted this evidence or shown a genuine dispute of material fact on this question, Defendants are entitled to summary judgment on Claims II and III.

### C. Even If Plaintiff's Discipline for Submitting Repeat Grievances Violated the Constitution, Defendants Cowles, Miller, and Barber Are Entitled to Qualified Immunity with Respect to Claim II

Summary judgment must be granted in favor of Defendants Cowles, Miller, and Barber on Claim II on the additional basis that they are entitled to qualified immunity.

Plaintiff attempts to define the clearly established law applicable to his claims as inmates' right not to be subjected to retaliation for filing grievances. *Memo. in Opp. to Def. Mot. Summ. J.*, Dkt. 96-2, at 6. But this defines the right at issue at a "high level of generality," something the Supreme Court has repeatedly instructed courts not to do. *Plumhoff*, 572 U.S. at 779. Instead, Plaintiff must "identify a case" clearly establishing

MEMORANDUM DECISION AND ORDER - 50

that he has a right not to be disciplined for filing repetitive grievances on the same issue. *Zorn*, 146 S. Ct. at 930; *Smith*, 81 F.4th at 1008; *Sharp*, 871 F.3d at 911.

Plaintiff has not identified such a case, and the Court in its independent research has not found one. Therefore, even if the Repeat Grievance Policy were unconstitutional—which it is not—the individual Defendants would be entitled to summary judgment on Claim II on the basis of qualified immunity.

For the foregoing reasons, Defendants' Motion for Summary Judgment will be granted.

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff is not entitled to summary judgment if, considering the evidence in the light most favorable to Defendants, the Court concludes that a genuine dispute of material fact exists. *See Scott*, 550 U.S. at 378 ("[C]ourts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion.") (internal quotation marks and alterations omitted). As explained above, however, even taking the evidence in the light most favorable to *Plaintiff*, the Court concludes that Plaintiff cannot prevail on his remaining claims. Accordingly, Plaintiff's Motion for Summary Judgment will be denied for the same reasons discussed with respect to Defendants' Motion for Summary Judgment.

## ORDER

**IT IS ORDERED:**

1.    Plaintiff's Motion for Stay (Dkt. 102) is **DENIED**.

2.    Plaintiff's Motion for Judicial Notice and Defendants' Motion for Judicial Notice (Dkts. 95 and 91-3) are **GRANTED IN PART** to the extent set forth above.

3.    Defendants' Motion for Summary Judgment (Dkt. 91) is **GRANTED**.

4.    Plaintiff's Motion for Summary Judgment (Dkt. 94) is **DENIED**.

DATED: July 24, 2026

Honorable Debora K. Grasham
United States Magistrate Judge

MEMORANDUM DECISION AND ORDER - 52